**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| KAWALJEET K. TAGORE,<br><br>             Plaintiff,<br><br>   v.<br><br>THE UNITED STATES OF AMERICA;<br>U.S. DEPARTMENT OF HOMELAND<br>SECURITY, FEDERAL PROTECTIVE<br>SERVICE; U.S. DEPARTMENT OF THE<br>TREASURY; INTERNAL REVENUE<br>SERVICE; JANET NAPOLITANO,<br>Secretary of the U.S. Department of<br>Homeland Security; TIMOTHY F.<br>GEITHNER, Secretary of the Treasury;<br>WILLIAM A. CARMODY, III; DAVID<br>HIEBERT; CHRISTINA NAVARETTE-<br>WASSON; SERGIO ARELLANO; JAMES<br>K. ELLIS; NIEVES NARAVEZ; AND<br>DOES 1-25,<br><br>             Defendants. | CASE NO. 4:09-CV-00027 |

<u>**PLAINTIFF'S OPPOSITION TO MOTION FOR PARTIAL DISMISSAL**</u>

Dockets.Justia.com

# TABLE OF CONTENTS

TABLE OF CITATIONS ........................................................................................... iv

NATURE AND STAGE OF THE PROCEEDING...................................................... 1

STATEMENT OF THE ISSUES.................................................................................. 1

STATEMENT OF FACTS ........................................................................................... 2

    A.    The Sikh Religion and the Kirpan ..................................................... 2

    B.    Courts consistently recognize that Kirpans are
         not weapons but articles of faith ....................................................... 4

    C.    Government agencies and others routinely
         accommodate Sikhs' Kirpans ............................................................ 4

    D.    The Government's termination of Tagore for wearing her kirpan ......... 5

SUMMARY OF THE ARGUMENT ........................................................................... 9

ARGUMENT ............................................................................................................ 10

I.    Tagore Properly Stated a Claim Under RFRA ................................................. 10

    A.    RFRA creates a cause of action for federal employees ..................... 10

         1.    The plain meaning of RFRA's statutory text is clear ............. 11

              a.  RFRA's text demonstrates a clear intent to apply RFRA
                  to all existing federal laws ................................................ 11

              b.  Fifth Circuit precedent mandates that the inquiry end
                  with the text of RFRA........................................................ 13

         2.    RFRA's legislative history is ambiguous ................................ 14

    B.    RFRA provides rights additional to the
         discrimination provisions of Title VII ................................................ 15

         1.    RFRA claims do not implicate *Brown*'s
             anti-discrimination rationale .................................................... 16

              a.    Brown is about discrimination claims, not other
                constitutional and statutory claims.................................... 16

        b.      RFRA does not punish discriminatory intent or treatment—it alleviates government-created burdens on religious exercise.........................................................17

        c.      RFRA claims, by their very nature, are based on different facts than Title VII claims........................................19

     2.     The exhaustion rationale present in the *Brown-Mineta* line of cases is not present here.................................................20

II.     Tagore makes no Title VII retaliation claim....................................21

III.    Tagore does not object to dismissal of the personal capacity claims against the individual Defendants. ..................................................22

CONCLUSION.....................................................................................................22

## <u>EXHIBIT LIST</u>

Exhibit 1-  Excerpt of S. Rep. No. 103-111 (1993)

Exhibit 2-  Excerpt of *Religious Freedom Restoration Act of 1991: Hearing on H.R. 2797 Before the Subcomm. on Civil and Constitutional Rights, H. Comm. on the Judiciary,* 102d Cong. (1992)

# TABLE OF CITATIONS

**Cases**

*Blackhawk* v. *Commonwealth,* 381 F.3d 202 (2004) ................................................................ 18
*Boerne* v. *Flores,* 521 U.S. 507 (1997).................................................................................... 15
*Brock* v. *United States,* 64 F.3d 1421 (9th Cir.1995) ............................................................. 17
*Brown* v. *General Services Administration,* 425 U.S. 820 (1976)........................ 2, 15, 16, 20, 21
*Church of the Lukumi Babalu Aye* v. *City of Hialeah,* 508 U.S. 520 (1993)............................. 18
*Cooper Indus.* v. *Aviall Servs.,* 543 U.S. 157 (2004)................................................................ 13
*Davis* v. *Passman,* 442 U.S. 228 (1979)................................................................................... 12
*Employment Division* v. *Smith,* 494 U.S. 872 (1990) ......................................................... 17, 18
*Francis* v. *Mineta,* 505 F.3d 266 (3d Cir. 2007)................................................................. 20, 21
*Gregson* v. *Zurich American Ins. Co.,* 322 F.3d 883 (5th Cir.2003)............................................ 2
*Guilzon* v. *C.I.R.,* 985 F.2d 819 (5th Cir.1993) ....................................................................... 13
*Hanson* v. *Hoffmann,* 628 F.2d 42 (D.C. Cir. 1980) ............................................................... 13
*Harrington* v. *State Farm Fire & Cas. Co.,* 563 F.3d 141 (5th Cir. 2009) ................................. 2
*In re Southern Scrap Material Co., LLC,* 541 F.3d 584 (5th Cir. 2008) ................................... 18
*Jackson* v. *Widnall,* 99 F.3d 710 (5th Cir. 1996)................................................................. 16, 17
*Lamie* v. *U.S. Trustee,* 540 U.S. 526 (2004)...................................................................... 11, 14
*People* v. *Partap Singh,* 135 Misc. 2d 701 (N.Y. Crim. Ct. 1987)............................................... 4
*Pinkerton* v. *Spellings,* 529 F.3d 513 (5th Cir. 2008) ............................................................... 10
*Pfau* v. *Reed,* 125 F.3d 927 (5th Cir. 1997)........................................................... 16, 17, 19, 20
*Rowe* v. *Sullivan,* 967 F.2d 186 (5th Cir. 1992) ................................................................. 12, 16
*Sherbert* v. *Verner,* 374 U.S. 398 (1963).......................................................................... 12, 17, 21
*State of Ohio* v. *Singh,* 690 N.E.2d 917 (Ohio Ct. App. 1996)................................................... 4
*Thompson* v. *Sawyer,* 678 F.2d 257 (D.C. Cir. 1982)................................................................ 12
*Wheeler* v. *Pilgrim's Pride Corp.,* 536 F.3d 455 (5th Cir. 2008).................................... 11, 13, 14
*Wilson v. Potter,* 159 Fed.Appx. 415 (3d Cir. 2005)................................................................ 12
*Wisconsin* v. *Yoder,* 406 U.S. 205 (1972) .......................................................................... 12, 17

**Statutes**

18 U.S.C. § 930.......................................................................................................................... 6, 8
42 U.S.C. § 2000e ...................................................................................................................... 1, 9
42 U.S.C. 2000bb .................................................................................... 1, 11, 12, 17, 19
42 U.S.C. 2000cc ........................................................................................................................... 19
Pub.L. 106-274, § 7, 114 Stat. 806 (2000)............................................................................. 15, 19

**Other Authorities**

H.R. REP. NO. 103-88 (1993)..................................................................................................... 14
Kapur Singh, ME JUDICE (2003) .................................................................................................. 3
*Religious Freedom Restoration Act of 1991: Hearing on H.R. 2797 Before the Subcomm. on
   Civil and Constitutional Rights, H. Comm. on the Judiciary,* 102d Cong. 325 (1992)...... 14, 15
S. REP. NO. 103-111 (1993) ....................................................................................................... 14

## NATURE AND STAGE OF THE PROCEEDING

Plaintiff Kawaljeet Tagore is a follower of the Sikh faith and a former employee of the Internal Revenue Service. As one of the religious requirements of her faith, Tagore carries a kirpan with her at all times. The kirpan is a small religious article worn on the body and resembling in shape a sword or knife. The part of Tagore's kirpan that resembles a knife blade is just three inches in length, and is incapable of cutting or harming anyone. The kirpan is a reminder of each Sikh's sacred duty to protect the weak and promote justice. Because Tagore wore her kirpan to work at a federal building, she was sent home and eventually required to work from home, with tasks increasingly below her grade. When she returned to the federal building with her kirpan, she was placed on leave, her paycheck was suspended, and she was eventually dismissed.

After exhausting her Title VII administrative remedies, Tagore filed this action against the named government defendants (the "Government") for violations of the Religious Freedom Restoration Act, 42 U.S.C. 2000bb *et seq.*("RFRA"), and for discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Tagore timely filed her complaint January 6, 2009. The Court extended the time to answer the complaint to May 1, 2009. On May 1, the Government filed a motion for partial dismissal, seeking dismissal of Tagore's RFRA claim and what it called Tagore's Title VII retaliation claim. The Government does not seek dismissal of Tagore's Title VII discrimination claim.

## STATEMENT OF THE ISSUES

On this motion, there is only one issue to be decided by the court: whether the court will apply the plain text of RFRA and allow Tagore's RFRA claim to go forward, or whether the

court will rule that RFRA is preempted by Title VII under *Brown* v. *General Services Administration*, 425 U.S. 820 (1976).

This issue arises on a motion to dismiss under Rule 12(b)(6), which "is viewed with disfavor and is rarely granted.'…This Court construes the complaint liberally in favor of the plaintiff, and takes all facts pleaded in the complaint as true." *Harrington* v. *State Farm Fire & Cas. Co.,* 563 F.3d 141, 147 (5th Cir. 2009) (quoting *Gregson* v. *Zurich American Ins. Co.,* 322 F.3d 883, 885 (5th Cir.2003)) (citations omitted).[1]  A complaint may be dismissed under Rule 12(b)(6) only if, after construing the complaint "in the light most favorable to the plaintiff and with every doubt resolved on his behalf," the complaint fails to state a valid claim for relief. *Id.* (citation omitted).

## STATEMENT OF FACTS

### A.    The Sikh Religion and the Kirpan

Because this case hinges on Tagore's adherence to the Sikh faith and that faith is not one necessarily familiar to the Court, Tagore provides the background information in this section to enable the Court to situate the case in its proper religious and historical context.

\* \* \*

The Sikh religion is a monotheistic religion that originated in the late fifteenth century in the northwestern area of South Asia that is known today as Punjab (now divided between India and Pakistan).  Compl. ¶ 24.  It is a distinct and independent religion and is not affiliated with any other religion.  Sikhism is now one of the world's largest religions, with approximately 20 million adherents worldwide.  *Id.* Approximately 500,000 Sikhs live in the United States.  *Id.*

---

[1]     Defendants also bring a motion to dismiss under Rule 12(b)(1), but as there is no retaliation claim in the complaint, *see infra* Section II, there is no need for a motion under Rule 12(b)(1).

Sikhs are mandated to take *amrit* (that is, be initiated into the Sikh faith), and thereafter keep five articles of faith, including the kirpan, on or as part of their person. Compl. ¶26. A Sikh makes an active decision to participate in an *Amrit Sanskar* ceremony when she is ready to commit herself to the tenets of the faith. Compl. ¶ 26. *Amrit Sanskar* is an analogue of baptism in Christianity or the bar/bat mitzvah in Judaism. *Id.*

Upon initiation through *Amrit Sanskar*, a Sikh is obligated to wear at all times the five Sikh Articles of Faith. Compl. ¶27. These are known colloquially as the "Five Ks" because they all begin with the Punjabi letter for "K". *Id.* The five Articles of Faith are: *Kesh* (maintaining hair unshorn and covered), *Kangha* (wooden comb), *Kara* (steel bracelet), *Kacha* (undergarment), and *Kirpan* (emblem of justice). *Id.*

The five articles of faith are physical manifestations of core Sikh spiritual values, reminding their bearer that her actions should be consistent with her beliefs. Compl. ¶ 28. The Articles of Faith also serve as a public expression of the Sikh believer's faith, identifying them to others as a Sikh (just as a yarmulke might identify a Jewish believer or a clerical collar might identify a Christian minister). The obligation of Sikhs to keep these articles of faith is a cornerstone of the Sikh religion and is commonly viewed by members of the Sikh faith to be among the central requirements of the Sikh religion. *Id. See also* Kapur Singh, ME JUDICE 258-264 (2003).

After initiation, a Sikh must wear all five Articles of Faith, even though it might result in the loss of property, freedom or life. Compl. ¶ 29. Because Sikhs have suffered much religious persecution throughout their history, many Sikhs have lost their lives because they have refused to stop bearing their Articles of Faith. *Id.* A kirpan, the Sikh article of faith at issue in this case,

commonly resembles a sword or knife but varies in length, and the portion representative of a "blade"[2] is often not sharp.

The kirpan is a religious article that obligates a Sikh to the highest ideals of generosity, compassion, and service to humanity. Compl. ¶ 30. It acts as a constant reminder to its bearer of a Sikh's solemn duty to protect the weak and promote justice for all. Compl. ¶ 30.

**B.      Courts Consistently Recognize that Kirpans are Not Weapons but Articles of Faith**

Misunderstanding regarding Sikhism and Sikh practices, including the wearing of the kirpan, is not uncommon, especially after the events of September 11, 2001.[3] This discrimination has resulted in criminal prosecutions, most of which have been resolved once the nature of the kirpan has been explained to the relevant authorities. Of the three criminal cases that have been litigated regarding a kirpan in the United States, none has resulted in a conviction. Courts have consistently recognized that kirpans are not weapons but are instead articles of faith.[4]

**C.      Government agencies and others routinely accommodate kirpans.**

Government agencies, private sector employers, and colleges across the United States have accommodated Sikhs who maintain the five articles of faith, including the kirpan. *See* Compl. ¶ 31. For example:

---

[2]      Quotation marks are used around the word "blade" here because Tagore disputes that the portion of her kirpan that resembles a blade is actually a blade as commonly understood, *i.e.*, that it is capable of cutting and/or inflicting injury.

[3]      Because Sikhs wear turbans at all times, they are often mistaken for Muslims.

[4]      *See*, *e.g.*, *People* v. *Partap Singh*, 135 N.Y. Misc. 2d 701 (N.Y. Crim. Ct. 1987) (dismissing kirpan charges *sua sponte*); *State of Ohio* v. *Singh*, 690 N.E. 2d 917, 920 (Ohio Ct. App. 1996) ("no evidence that [defendant] possessed or carried the kirpan as a weapon and no evidence that the kirpan was designed or adapted for use as a weapon."); *cf. id.* at 621 (Painter, J., concurring) ("[t]o be a Sikh is to wear a kirpan—it is that simple.").

- The Federal Protective Service, a sub-division of the U.S Department of Homeland Security—both Defendants in this case—has granted an accommodation allowing Sikh contract security guards to carry kirpans in federal facilities;

- The International Monetary Fund has granted an accommodation allowing a Sikh worker to carry a kirpan in its Washington, D.C. office;

- AT&T has granted an accommodation allowing a Sikh worker to carry a kirpan into an Ohio office;

- Harvard University and the University of California at Berkeley allow Sikh students to carry kirpans on their campuses.

Compl. ¶ 31.

Indeed, in isolated instances in which private employers have refused to accommodate Sikh employees' kirpans, the United States government itself has itself filed suit to vindicate Sikhs' rights.[5]

### D. The Government's termination of Tagore for wearing her kirpan.

Plaintiff Kawaljeet Kaur Tagore is a citizen of the United States of America and resident of Houston. Compl. ¶ 23. She is a member of the Sikh faith. Compl. ¶ 24. In 2004, Ms. Tagore began working for the Internal Revenue Service ("IRS") as an Internal Revenue Agent. Compl. ¶ 25. Her workplace was the Mickey Leland Federal Building ("Leland Building") in downtown Houston. Compl. ¶ 25.

On April 14, 2005, consistent with the teachings of Sikhism, Ms. Tagore was formally initiated into the Sikh faith by undergoing the *Amrit Sanskar* ceremony. Compl. ¶ 26.

---

[5] *See EEOC* v. *HCR Manor Care*, No. 2:07-cv-1370 (E.D.Mich., currently pending); *EEOC* v. *Heartland Empl. Svcs.*, No. 08-CV-00460 (E.D.Cal., currently pending).

Consistent with her religious beliefs, after her participation in an *Amrit Sanskar* ceremony Ms. Tagore began carrying a kirpan. Compl. ¶ 32.

On April 18, 2005, Ms. Tagore had a discussion with her supervisor at the IRS, Nieves Narvaez, during which he expressed concern about her ability to carry her kirpan in her workplace. Compl. ¶ 33. On April 19, 2005, Mr. Narvaez asked Tagore for written information about the kirpan, and discussed it with her. Compl. ¶ 34.

As a result of this discussion, Ms. Tagore subsequently began carrying a shorter kirpan to work, one that was as small as her religious conscience would allow. Compl. ¶ 35. The edge of this kirpan was approximately three inches long and was *not* sharp or capable of inflicting bodily injury. Compl. ¶ 35. The kirpan's total length was approximately six inches. Compl. ¶ 35.

On April 20, 2005, Tagore, through counsel, provided the IRS with written information about the kirpan and requested that she be provided an accommodation to carry her kirpan into her workplace in the Leland Building. Compl. ¶ 36. On approximately the same day, Narvaez informed Tagore to leave work and that carrying her kirpan to her workplace violated agency rules of conduct and federal law, namely 18 U.S.C. § 930. Compl. ¶ 36.

18 U.S.C. § 930 prohibits people from possessing or causing to be present dangerous weapons in federal facilities, including "knives" with "blades" of 2.5 inches or longer. Compl. ¶ 37. The statute contains certain exemptions including "the lawful carrying of firearms or other dangerous weapons in a Federal facility incident to hunting or other lawful purposes". 18 U.S.C. § 930(d)(3); compl. ¶ 37. However, 18 U.S.C. § 930 does not define "knife" or "blade". Compl. ¶ 38. The Federal Protective Service ("FPS") is responsible for ensuring the safety and security of the Leland Building, and enforces 18 U.S.C. § 930 as applied to the Leland Building. Compl. ¶ 39.

In April of 2005, each time Tagore entered the Leland Building while wearing a kirpan, she consistently was able to pass through the Federal Protective Service security checkpoint—including walking through a metal detector—without incident. Compl. ¶ 40.

During Tagore's employment with the IRS, the IRS distributed scissors, letter openers, and box cutters to its employees working in the Leland Building. Unlike Ms. Tagore's kirpan, these objects were sharp and dangerous. Compl. ¶ 41. In many instances, these objects were much longer than Tagore's kirpan. Compl. ¶ 41.

The IRS distributed a pair of scissors and a letter opener to Tagore, which she used to perform her job responsibilities outside of the Leland Building. Compl. ¶ 42. The IRS and FPS knowingly permitted Ms. Tagore to pass through the FPS security checkpoint in the Leland Building with the IRS-distributed scissors and letter opener in her possession. Compl. ¶ 42. Tagore also witnessed a federal employee use a kitchen knife in the Leland Building that was longer and sharper than her kirpan. Compl. ¶ 43.

There are hundreds of objects in the Leland Building that are both sharper and longer than Tagore's kirpan. Compl. ¶ 44. Defendants know that these objects are present in the Leland Building but allow them anyway. Compl. ¶ 45. In effect, Defendants have exempted those objects from the sweep of the regulations that they applied to burden Tagore's religious exercise. Compl. ¶ 45.

During Ms. Tagore's employment with the IRS, the IRS and/or FPS knowingly permitted certain individuals carrying firearms and other dangerous weapons to pass through the FPS security checkpoint in the Leland Building without disarming them. Compl. ¶ 46. FPS does not check packages of office supplies ordered by and delivered to the federal offices in the Leland building. Compl. ¶ 47. Defendants have not removed scissors and box cutters—which unlike

Tagore's kirpan can cut or cause bodily harm—from federal buildings, including the Leland Building. Compl. ¶ 48.

After the IRS sent Tagore home, the agency initially told her that she must use her personal vacation days. Compl. ¶ 49. The agency ultimately allowed Tagore to take "flexi-place" leave, through which she could work primarily from home. Compl. ¶ 49. While Tagore was on flexi-place leave, the IRS and/or FPS knowingly permitted her to periodically enter into and work in other Federal facilities—as that term is defined under 18 U.S.C. § 930—with her kirpan, scissors, and letter opener in her possession. Compl. ¶ 50.

Tagore worked at home on flexi-place for over nine months. Compl. ¶ 51. As time passed she was increasingly given assignments that were below grade work or that were clerical tasks. Compl. ¶ 51.

IRS employees spoke to FPS employees William A. Carmody, III, District Commander, and David Hiebert, Area Commander, about Tagore's kirpan. Compl. ¶ 52. The FPS and IRS took the position that allowing Ms. Tagore in the Leland Building with her kirpan violated 18 U.S.C. § 930 because the kirpan's edge was over 2.5 inches. Compl. ¶ 52.

The IRS refused to provide a reasonable accommodation for Ms. Tagore's kirpan although doing so would not have placed an undue hardship on the agency. Compl. ¶ 53. The IRS employees who made this decision included Group Supervisor Nieves Narvaez, Senior Manager James K. Ellis, Director of Field Operations Sergio Arellano, and Equal Employment Opportunity Director Christina Navarete-Wasson. Compl. ¶ 53. The IRS instead asked Ms. Tagore to consider modifying her kirpan, or to not carry it into the Leland Building. Compl. ¶ 53.

On January 20, 2006, Sergio E. Arellano, IRS Director of Field Operations, directed Ms. Tagore to modify her kirpan and report to work at the Leland Building by January 30, 2006. Compl. ¶ 54.  On January 30, 2006, Ms. Tagore reported to work at the Leland Building wearing her religiously-mandated kirpan.  Compl. ¶ 55.  She had not modified it. Compl. ¶ 55.  She told FPS officers that she was wearing her kirpan and they disallowed her from entering the building. Compl. ¶ 55.

IRS thereafter charged her with being "AWOL" (Absent Without Leave).  Compl. ¶ 56. The agency removed her from flexi-place leave, and stopped paying her salary.  Compl. ¶ 56.

On or about March 9, 2006, Tagore, at her supervisor's direction, went to the Leland Building to return files.  Compl. ¶ 57.  She entered the building and was able to pass through FPS security, including a metal detector, while wearing her kirpan.  Compl. ¶ 57.  The IRS sent her home when the agency learned that she was carrying her kirpan.  Compl. ¶ 57.

On or about July 11, 2006, the IRS terminated Tagore's employment.  Compl. ¶ 59.  Prior to Tagore's termination, no IRS or FPS employee ever inspected Tagore's kirpan in order to determine whether bringing it into the Leland Building would have violated 18 U.S.C. § 930 or agency Rules of Conduct.  Compl. ¶ 60.

Tagore has consistently sought religious accommodation from the Government, and is hopeful that the Government will change its mind regarding its ability to accommodate the wearing of kirpans.  Dkt. No. 18, ¶ 13 (indicating Tagore's efforts to settle case by obtaining accommodation of the kirpan).

## SUMMARY OF THE ARGUMENT

The Government claims that Tagore cannot bring a RFRA claim because it is preempted by Title VII.  Mtn. 11-15.  This is wrong.  First, it contradicts the plain and unambiguous

meaning of the statutory text. Congress did not create a Title VII carve-out from RFRA, and in fact amended RFRA to ensure that it would apply to the federal government and all federal laws. To read the statute otherwise would contravene not only its plain text, but binding Fifth Circuit precedent. And even if the Court were to turn to legislative history, it would discover scant evidence that Title VII preempts RFRA claims by federal employees.

Second, while the Government is correct that Title VII is the near-exclusive remedy[6] for federal employee *discrimination*, it does not preclude federal employees from bringing claims to vindicate all other statutory rights. RFRA's text and history are clear: it does not exist solely, or even primarily, to remedy religious discrimination. Instead, it exists to remove government-created burdens on religious conduct, whether motivated by discrimination or not. Because it protects a different set of federally created rights, it is not preempted by Title VII.

Finally, the Government spends several pages of its motion arguing that Tagore failed to exhaust her retaliation claim. But Tagore did not bring a retaliation claim, so there was nothing to exhaust. For these reasons, the Government's motion to dismiss should be denied in full.

## ARGUMENT

**I.      Tagore properly stated a claim under RFRA.**

**A.      RFRA creates a cause of action for federal employees.**

RFRA's statutory text clearly authorizes a cause of action against federal agencies and officials for burdens on religious exercise, and it includes no exception when the plaintiff happens to be a federal employee. The court need not look beyond the text of the statute.

---

[6]      Congress has statutorily provided for other remedies for discrimination, including the ADA. *See, e.g., Pinkerton* v. *Spellings*, 529 F.3d 513 (5th Cir. 2008) (stating two separate causes of action are available for federal employees under the ADA).

However, even if it does consult the legislative history, it will find that history to be at best ambiguous on the subject of Title VII preemption.

1.    **The plain meaning of RFRA's statutory text is clear.**

      a.    **RFRA's text demonstrates a clear intent to apply RFRA to all existing federal laws.**

RFRA's plain language creates a cause of action against the federal government. "'It is well established that when a statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Wheeler* v. *Pilgrim's Pride Corp.*, 536 F.3d 455 (5th Cir. 2008) (quoting *Lamie* v. *U.S. Trustee,* 540 U.S. 526, 534, 124 S. Ct. 1023, 1030 (2004)). RFRA's text could not be clearer: "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section." 42 U.S.C. 2000bb-1(a). Section (b) codifies the strict scrutiny standard. 42 U.S.C. 2000bb-1(b).

RFRA goes on to specify that "the term 'government' includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States." 42 U.S.C. 2000bb-2(1). By its plain language, the statute requires federal agencies, like the IRS, to comply with RFRA. It creates no carve-outs, no exceptions, not even for government agencies acting as employers. On this point, Congress left no ambiguity: "This chapter applies to ***all Federal law***, ***and the implementation of that law,*** whether statutory or otherwise, and whether adopted before or after November 16, 1993." 42 U.S.C. 2000bb-3(a) (emphasis added). This accords with RFRA's stated purpose, "to guarantee [the compelling interest test's] application ***in all cases*** where free exercise of religion is substantially burdened" and "to provide a claim or defense to persons whose religious exercise is substantially burdened by government." 42 U.S.C. 2000bb(b) (emphasis added). Moreover, RFRA is designed to preempt all law,

"whether adopted **before or after** November 16, 1993." 42 U.S.C. 2000bb-3(a) (emphasis added). Thus RFRA presumptively preempts all federal statutes, no matter the subject area and no matter the date of enactment, unless RFRA is expressly excepted. Since there is no such exception here, the Government's argument that RFRA does not apply to Title VII is contravenes the plain, clear and unambiguous text of four separate sections of the statute.

The Government argues that RFRA must be preempted by Title VII because RFRA incorporates "pre-*Smith* First Amendment case law." As quoted above, RFRA's purpose is "to restore the compelling interest test as set forth in *Sherbert* v. *Verner*, 374 U.S. 398[, 83 S. Ct. 1790] (1963) and *Wisconsin* v. *Yoder*, 406 U.S. 205[, 92 S. Ct. 1526] (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. 2000bb. The Government's suggestion that the court look to *Sherbert* and *Yoder* caselaw when interpreting RFRA is sensible. But what the Government does not say on this subject is far more interesting than what it does say.

The Government does not cite—and Tagore has not discovered—a single pre-RFRA case where Title VII preempted claims based on the *Sherbert-Yoder* line of caselaw. The *Brown* decision has often been used to supplant racial and gender discrimination claims actionable under the Equal Protection Clause,[7] and even the odd religious discrimination claim,[8] but the courts are silent on whether *Brown* also applies to the provisions of the Free Exercise Clause.[9]

---

[7]    *See, e.g., Rowe* v. *Sullivan,* 967 F.2d 186 (5th Cir. 1992); *Thompson* v. *Sawyer*, 678 F.2d 257 (D.C. Cir. 1982) (stating Title VII exists to vindicate government employees' existing Fifth Amendment rights).

[8]    *See, e.g., Wilson* v. *Potter*, 159 Fed. Appx. 415 (3d Cir. 2005).

[9]    Non-*Sherbert* precedent from that time period suggests that First Amendment claims would not be precluded. Prior to RFRA, courts created separate constitutional causes of action for federal employees, which could be brought independently of Title VII. See *Davis* v. *Passman*, 442 U.S. 228, 99 S. Ct. 2264 (1979) (sex discrimination claim under the Fifth Amendment); *Hanson* v. *Hoffmann*, 628 F.2d 42 (D.C. Cir. 1980) (authorizing sex

Given this lack of legal history, RFRA's textual references to *Sherbert* offer no guidance on the question of Title VII preemption. Read together with the rest of the statute, they indicate that RFRA broadens the religious freedom of federal employees.

### b. Fifth Circuit precedent mandates that the inquiry end with the text of RFRA.

This Court's determination of the Title VII preemption question should begin and end with the text of RFRA. The Fifth Circuit has instructed that courts should not go beyond the plain text of a statute. "Fifth Circuit law is crystal clear that when, as here, the language of a statute is unambiguous, this Court has no need to and will not defer to extrinsic aids or legislative history." *Guilzon* v. *C.I.R.,* 985 F.2d 819, 823 n. 11 (5th Cir. 1993). *See also Cooper Indus.* v. *Aviall Servs.,* 543 U.S. 157, 167, 125 S. Ct. 577, 584 (2004) ("Given the clear meaning of the text, there is no need to ... consult the purpose of [the statute] at all.").

As the *Wheeler* case cited above demonstrates, the Fifth Circuit takes this canon of construction quite seriously, and does not shy away from circuit splits when other courts violate that rule: "We acknowledge that our decision today conflicts with nearly every decision of our sister Circuits on this issue. Their decisions, however, generally reached beyond the PSA's clear and unambiguous text, choosing instead to be guided by its legislative history, 'antitrust ancestry,' and 'policy considerations.'" *Wheeler,* 536 F.3d at 460-61 (citation omitted). The defendants here, like those in *Wheeler,* seek to substitute vague policy rationales for the plain language of the statute. For this maneuver, the court does not mince words: "We believe that their decisions should have been guided by the text." *Id.*

---

discrimination claim under the Fifth Amendment and free speech claim under the First Amendment).

The court's reason for this hard line is the ambiguous and often conflicted nature of legislative history. "'In this manner we,' unlike our sister Circuits, 'avoid the pitfalls that plague too quick a turn to the more controversial realm of legislative history.'" *Id.* (citing *Lamie,* 540 U.S. at 536, 124 S. Ct. at 1031). The Fifth Circuit mandates that legislative history be a last resort, not a first step. Legislative history is particularly problematic in this case, where the statutory text is clear, but the statute's history and congressional intent as expressed in committee reports are muddled.

### 2. RFRA's legislative history is ambiguous.

Even if this court were to resort to the "controversial realm of legislative history," that history would not mandate Title VII preemption. The Government, and the *Mineta* case it relies upon, hangs its reasoning upon one statement from the legislative history: "Nothing in this act shall be construed as affecting religious accommodation under Title VII of the Civil Rights Act of 1964." S. REP. NO. 103-111 at 13 (1993) *reprinted in* 1993 U.S.C.C.A.N. 1879, 1902 (attached as Ex. 1); *see also* H.R. REP. NO. 103-88, at 9 (1993) (containing almost identical language). A footnote to this text cites the part of Title VII mandating that employers make religious accommodations. S. REP. NO. 103-111 at 13 n.38. This single sentence provides no conclusive proof that Congress meant to carve out an exemption for federal employers.

The committees' language suggests that they were concerned with "religious accommodations" rather than *Brown*. The only other indicator of legislative intent Tagore has been able to discover are two mentions of Title VII in the committee hearings. *See Religious Freedom Restoration Act of 1991: Hearing on H.R. 2797 Before the Subcomm. on Civil and Constitutional Rights, H. Comm. on the Judiciary,* 102d Cong. 325 (1992) (attached as Ex. 2); *id.* at 329. Those discussions were about the possibility of private religious employers

circumventing Title VII by using RFRA to justify pregnancy discrimination or restrict abortion rights. *Id.* Thus the scant legislative history on the subject suggests that the reference to "religious accommodation" was a comment on the impact of RFRA on private religious employers, not the application of Title VII to government employers.

The most important bit of legislative history, however, is not a passing reference in a 1993 committee report, but the amendments Congress made to RFRA in 2000. RFRA's reach became even clearer then, when, in response to *Boerne* v. *Flores,* 521 U.S. 507, 117 S. Ct. 2157 (1997), Congress modified RFRA to limit its scope to the federal government. *See* Pub.L. 106-274, § 7, 114 Stat. 806 (2000) (new religious freedom act which included amendments to RFRA). After *Boerne* Congress was under no obligation to reaffirm RFRA, yet it chose to renew its commitment to RFRA and subject the federal government alone to its strictures. Most importantly, Congress said nothing at all about Title VII when it renewed its commitment to RFRA in 2000. The Government's reading of RFRA cuts against Congress's decision to redouble its commitment to RFRA.

When all the statements and history are examined, the resort to legislative history confuses more than it clarifies—the very evil the Fifth Circuit warned of in *Wheeler.* The legislative history is ambiguous; the text is plain. The Government has offered no compelling reason why this Court should buck binding precedent and ignore RFRA's clear text.

**B.      RFRA provides rights additional to the anti-discrimination provisions of Title VII.**

The Government also argues that Title VII preempts RFRA lawsuits by federal employees under *Brown* v. *GSA,* 425 U.S. 820, 96 S. Ct. 1961 (1976). The Government relies on Fifth Circuit caselaw stating that Title VII precludes other tort claims. Mtn. at 12. But those precedents apply only if this court is willing to ignore RFRA's plain statement that it applies to

"all Federal law, and the implementation of that law," and to federal officers and agencies. *See supra.*

Even if this court were to accept that reading of the law, *Brown* does not preclude RFRA claims by federal employees. *Brown* and its progeny are built around two central ideas: (1) Title VII is the exclusive remedy for federal employment discrimination, and (2) plaintiffs should not be permitted to circumvent Title VII's administrative scheme by resorting to similar tort claims. Neither interest is implicated here. RFRA is not a non-discrimination statute; it exists to guarantee rights of a different sort than the non-discrimination guarantees of Title VII. For the same reason, it does not allow circumvention because it creates a different set of rights.

### 2. RFRA claims do not implicate *Brown*'s anti-discrimination rationale.

#### a. *Brown* is about discrimination claims, not other constitutional and statutory claims.

*Brown, Pfau, Jackson,* and similar cases are based upon the notion that Title VII provided the exclusive remedy for employment discrimination and therefore Title VII supplants other non-discrimination guarantees. *See, e.g., Brown* v. *GSA,* 425 U.S. at 835, 96 S. Ct. at 1969 ("[Title VII] provides the exclusive judicial remedy for claims of discrimination in federal employment."); *Pfau* v. *Reed*, 125 F.3d 927, 932 (5th Cir. 1997) ("Title VII provides the 'exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination.'"); *Jackson* v. *Widnall*, 99 F.3d 710, 716 (5th Cir. 1996) ("title VII provides the exclusive remedy for employment discrimination claims raised by federal employees."); *Rowe* v. *Sullivan,* 967 F.2d 186, 189 (5th Cir. 1992) ("the provisions of Title VII of the Civil Rights Act applicable to claims of racial discrimination in federal employment are the exclusive and preemptive remedy for such claims."). The Fifth Circuit interprets *Brown* to mean that Title VII precludes lawsuits which "arise out of the same facts" as a Title VII claim. *Jackson,* 99 F.3d at

716.[10] Title VII therefore covers both general discrimination claims and claims stemming from the same discrimination facts, such as an intentional infliction of emotional distress claim brought in addition to a Title VII gender discrimination claim.[11]

But RFRA is not about discrimination—it is designed to alleviate government-created burdens on religious exercise. Nor is it similar to the claim in *Pfau,* which penalized outrageous conduct that was part and parcel of the core discrimination claim. *Pfau,* 125 F.3d at 933 (dismissing emotional distress claim as duplicative of sex discrimination claim). Therefore it makes no sense to extend Title VII's preemptive effect to RFRA. RFRA was designed to remedy government actions which remain perfectly legal under Title VII.

### b. RFRA does not punish discriminatory intent or treatment—it alleviates government-created burdens on religious exercise.

RFRA was written "to restore the compelling interest test as set forth in *Sherbert* v. *Verner*, 374 U.S. 398 (1963) and *Wisconsin* v. *Yoder*, 406 U.S. 205 (1972)," which had been "virtually eliminated" by the Supreme Court in *Employment Division* v. *Smith,* 494 U.S. 872, 110 S. Ct. 1595 (1990). 42 U.S.C. § 2000bb; Mtn. at 12-13. But the "substantial burden" plaintiffs had to show under *Sherbert* is not the same thing as intentional discrimination. To equate the two would be to conflate *Sherbert* and *Smith* and rob RFRA of its purpose.

---

[10] In *Jackson,* the Fifth Circuit treated the plaintiff's non-constitutional tort claims differently from his constitutional tort claims, which were precluded by Title VII because they "arise out of the same facts." 99 F.3d at 716. The court dismissed non-constitutional tort claims not because they were precluded, but because they had not been exhausted. *Id.* at 716&n.10.

[11] In this regard, the Fifth Circuit explicitly splits with the Ninth Circuit, which permits additional claims based upon the same facts if they are "more than [] discrimination." *Brock* v. *United States,* 64 F.3d 1421, 1423 (9th Cir.1995); *Pfau,* 125 F.3d at 933 n.2 (confirming circuit split). Since this Court is bound by *Pfau*, Tagore does not challenge it here, reserving the right to do so on appeal.

That is because even *Smith* prohibits actual religious discrimination. *Smith* prohibits government infringement of religious exercise through laws which are not neutral or generally applicable. *See Smith,* 494 U.S. at 879, 110 S. Ct. at 1600 (extending its reasoning only to "valid and neutral law[s] of general applicability"); *Church of the Lukumi Babalu Aye* v. *City of Hialeah,* 508 U.S. 520, 531-32, 113 S. Ct. 2217, 2226 (1993) ("Neutrality and general applicability are interrelated, and, as becomes apparent in this case, failure to satisfy one requirement is a likely indication that the other has not been satisfied. A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest.").[12] By its very definition, religious discrimination fails the neutrality and general applicability requirements. Therefore, if RFRA means anything, it must offer some protection beyond merely insulating religious adherents from intentional government discrimination. Since this Court is bound to interpret federal statutes in a way that does not render them "mere surplusage," it must give RFRA some meaning beyond *Smith*. *In re Southern Scrap Material Co., LLC*, 541 F.3d 584, 594 (5th Cir. 2008) (citation omitted).

*Smith* does not stop with intentional discrimination. Even some unintentionally discriminatory conduct fails the *Smith* test. "A law fails the general applicability requirement if it burdens a category of religiously motivated conduct but exempts or does not reach a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree . . .." *Blackhawk* v. *Commonwealth,* 381 F.3d 202, 209 (2004) (Alito, J.) (citing *Smith* and *Lukumi*). In other words, *Smith* itself protects religious believers not just from intentional discrimination, but also from government actions not motivated by discriminatory animus which nevertheless treat religions unequally. Post-*Smith*,

---

[12]     *Lukumi* was decided prior to the passage of RFRA.

the Free Exercise Clause prohibits both intentional religious discrimination and disparate treatment of religions.

RFRA's explicit purpose is to go further than *Smith*. *See* 42 U.S.C. 2000bb (expressing disapproval of *Smith* and a desire to return to the *Sherbert/Yoder* standard). RFRA protects religious individuals not just from discrimination, and not just from non-neutral laws, but also from "substantial burdens" on religious exercise. 42 U.S.C. 2000bb-1. RFRA protects individuals from those burdens "even if the burden results from a rule of general applicability." *Id.* The RFRA plaintiff need not prove intentional discrimination, she need not even prove disparate treatment, she need only prove that her religious exercise was substantially burdened.

The difference between *Smith* and Title VII discrimination claims on the one hand and RFRA substantial burden claims is borne out by the structure of RFRA's companion statute, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. 2000cc *et seq.* ("RLUIPA"). RLUIPA, which was enacted by the same 2000 public law that amended RFRA, Pub.L. 106-274, 114 Stat. 803 (2000), creates three sorts of claims for religious land users: "substantial burden" claims, "equal terms" claims, and "nondiscrimination" claims. *Compare* 42 U.S.C. 2000cc(a) *with* 42 U.S.C. 2000cc(b)(1) *and* 42 U.S.C. 2000cc(b)(2). The distinction RLUIPA makes between nondiscrimination claims and substantial burden claims erases any doubt that RFRA—which uses substantially identical language to RLUIPA's substantial burden provisions—targets burdens rather than intentional discrimination.

### c. RFRA claims, by their very nature, are based on different facts than Title VII claims.

This unique type of protection sets RFRA apart from Title VII. It also sets RFRA apart from state tort claims which merely describe additional injuries or additional reasons for making discriminatory conduct unlawful. *See Pfau,* 125 F.3d at 933. RFRA sets a different standard for

federal employers, a higher bar than even disparate impact claims under Title VII. RFRA, by its nature, is not a federal employment discrimination claim of the type prohibited by *Brown*. It is not even a claim "arising from the same facts" like the emotional distress claim present in *Pfau*. It is a separate and independent claim, based upon the nature of the burden on a plaintiff's religious exercise, rather than the existence of discrimination or the treatment of one faith vis-à-vis another.

Tagore's RFRA claim will also turn on different facts than her Title VII claim. Her Title VII claim will turn on the existence of discrimination by the Government: how the Government treats Tagore and other Sikhs in comparison to other employees and faiths and whether there was any discriminatory intent motivating the adverse actions taken against Tagore. RFRA looks instead at the burden on Tagore's religious exercise—whether the regulations burden Tagore's ability to live out her religion's precepts, and how deeply.[13] The court should not treat these fundamentally different claims as if one were merely the outgrowth of the other.

### 3. The exhaustion rationale present in the *Brown-Mineta* line of cases is not present here.

Brown's second rationale for Title VII preemption is the necessity of administrative exhaustion. Most of the cases dealing with Title VII preemption involve plaintiffs attempting an end run around Title VII's exhaustion requirements. *See, e.g., Brown,* 425 U.S. at 823 (plaintiff failed to seek administrative appeal or file his complaint in a timely fashion); *Francis* v. *Mineta*, 505 F.3d 266 at 272 (3d Cir. 2007) (plaintiff made no attempt to exhaust administrative remedies

---

[13]     The relevant facts for the Government's defense are also significantly different under RFRA. The Government interest at stake must be examined to determine whether it is compelling, and the means used and alternatives proposed must be scrutinized to determine whether the Government's actions were in fact the least restrictive alternative. Under Title VII, there is no need to examine facts to determine whether the government used the least restrictive alternative.

before filing RFRA lawsuit); *Rowe,* 967 F.2d at 190-91 (plaintiff failed to meet Title VII deadlines).  Much of the reasoning in those cases rests on the notion that the federal government does not permit individuals to skip Title VII's exhaustion scheme.  *See, e.g., Brown,* 425 U.S. at 832-33, 96 S. Ct. at 1963 (reasoning based in part on the fear that plaintiffs would be able to circumvent Title VII's exhaustion requirements through "artful pleading"); *Mineta,* 505 F.3d at 271 (expressing concern that plaintiff will "do an end run around the legislative scheme of Title VII").

The exhaustion rationale is inapplicable here for two reasons.  First, because Title VII and RFRA present fundamentally different sorts of claims, *see supra*, exhaustion of a Title VII claim should not affect how a RFRA claim proceeds.

Second, Tagore herself is clearly not attempting to evade the administrative process. Tagore went through a two-year process to exhaust her administrative remedies.  She is not attempting any end-run around Title VII; she is merely asserting her RFRA claims at the conclusion of the process, at the same time as her Title VII claims.  To the degree that the above cases rely upon an exhaustion rationale, they should not be applied to Tagore's RFRA claim.

* * *

Congress designed RFRA to remedy wrongs that Title VII and existing anti-discrimination law could not address.  Tagore's RFRA claim is built upon different facts than her Title VII claim and requires different proofs than her Title VII claim does.  Title VII does not preempt Tagore's RFRA claim.  If anything, RFRA preempts Title VII.

## II.    Tagore makes no Title VII retaliation claim.

The Government has moved to dismiss what it apparently believes to be a Title VII retaliation claim.  Mtn. at 15-19.  But Tagore has made only two claims: one Title VII religious

discrimination claim and one substantial burden claim under RFRA. *See* Compl. Counts I & II. She did not raise a separate retaliation claim during the administrative investigation and litigation that preceded the filing of her judicial complaint, and has no intention of asserting such a claim in the present district court litigation. Although she does assert that intentional retaliation against her would be probative of bias and therefore relevant to her Title VII discrimination claim, Compl. ¶ 73 (the only time "retaliation" is mentioned in the Complaint), she has not brought a separate Title VII retaliation claim.

## III. Tagore does not object to dismissal of the personal capacity claims against the individual Defendants.

The Government also seeks dismissal of some of the claims against the individual defendants. Tagore has no objection to the dismissal of the individual Defendants in their personal capacities. However, she continues to maintain her claims against the individual defendants in their official capacities.

Tagore also has no objection to dismissal of the Doe Defendants.

## CONCLUSION

For the foregoing reasons, the Defendants' motion should be denied with respect to the RFRA claim.


Respectfully submitted,

_____s/ Eric C. Rassbach_____
Eric C. Rassbach
Admitted *pro hac vice*
Texas Bar No. 24013375
1350 Connecticut Ave. NW, Ste. 605
Washington, DC 20036
Telephone: (202) 349-7211
erassbach@becketfund.org

Scott Newar
Texas Bar Number 14940900
700 Louisiana, Suite 2550
Houston, Texas 77002-2728
Telephone: (713) 226-7950

The Sikh Coalition
Harsimran Kaur
District of Columbia Bar Number 493428
39465 Paseo Padre Pardway, Ste. 3550
Fremont, CA 94538
Telephone: (510) 659-0900, ext. 92

The Sikh Coalition
Amardeep Singh Bhalla
New York Bar Number AB4371
40 Exchange Pl., Ste. 728
New York, NY 10005
Telephone: (212) 655-3095, ext. 83

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2009, I electronically transmitted the foregoing Plaintiff's Opposition to Defendants' Motion to Dismiss to the Clerk's Office by the ECF System for filing and transmittal of a Notice of Electronic filing to the following ECF registrants:

Vesper Mei
United States Department of Justice
Civil Division Federal Programs Branch
PO Box 883 Ben Franklin Station
Washington, DC 20044
202-514-4686
vesper.mei@usdoj.gov

_____s/ Eric C. Rassbach____
Eric C. Rassbach
